UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

NICHOLAS PISCOPO,

                Plaintiff,

v.                                               Case No.  5:04-cv-217-Oc-GRJ

JO ANNE B. BARNHART, Commissioner
of Social Security,

                Defendant.

_____/

## ORDER

      Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying his claims for a period of disability, Childhood Disability Insurance Benefits, and Supplemental Security Income.  (Doc. 1.)  The Commissioner has answered (Doc. 10), and both parties have filed briefs outlining their respective positions.  (Docs. 19 & 20).  For the reasons discussed below, the Court finds that the Commissioner's decision is due to be **AFFIRMED.**

## I. PROCEDURAL HISTORY

      Plaintiff originally filed applications for a period of disability and Childhood Supplemental Security Income benefits on July 3, 1995. (R. 25-27).  Plaintiff was found disabled on September 12, 1995 (R. 29) for a period beginning June 1, 1995 due to borderline intellectual functioning. Plaintiff was also receiving, at that time, childhood disability benefits under his father's account prior to reaching age 18.  On August 22, 1996, Congress enacted Public Law 104-193, the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 which required all supplemental security

childhood disability beneficiaries who were eligible in the month before the month in which they turned eighteen years old to have their eligibility redetermined under the adult standards.  In October 2001, the agency redetermined Plaintiff's benefits and found that he was no longer considered disabled.  (R. 45-47.)  Plaintiff requested a hearing before an Administrative Law Judge (R. 455), which was continued twice so that Plaintiff could find an attorney to represent him.  On December 17, 2003, a hearing on the merits of Plaintiff's case took place.   On January 27, 2004, following the hearing, Administrative Law Judge Franklin D. Holder (the "ALJ") issued a decision unfavorable to Plaintiff.  (R. 14-22.)  Plaintiff's request for review of that decision was denied by the Appeals Council on April 9, 2004 (R. 4), rendering the ALJ's decision the final decision of the Commissioner.  On May 13, 2004, Plaintiff filed the instant appeal to this Court of the Commissioner's final decision.  (Doc. 1.)

## II. <u>ISSUES PRESENTED</u>

Plaintiff argues that the Commissioner committed two errors. First, Plaintiff contends that his impairments met disability Listing 12.05C or D for mental retardation. Second, Plaintiff contends that the Commissioner failed to adequately develop the record with respect to some of the medical evidence and Plaintiff's reasons for homebound schooling.  (Doc. 19.)  The Commissioner asserts in response that there was substantial evidence to support the ALJ's finding that in considering all of Plaintiff's impairments, Plaintiff is not disabled, and therefore, does not meet the definition of mental retardation in Listing 12.05C.  The Commissioner also contends that there was substantial evidence in the record and thus it was not necessary to contact additional

medical experts, re-contact Dr. Hippolito, or in any other way more fully develop the record in order to determine whether the Plaintiff was disabled.

### III. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1]  Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3]  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4]  However, the district court will reverse the Commissioner's decision on plenary review if the decision

---

[1] <u>See</u> 42 U.S.C. § 405(g) (2004).

[2] <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982) and <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); <u>accord</u>, <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] <u>Edwards</u>, 937 F.2d at 584 n.3; <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] <u>Foote</u>, 67 F.3d at 1560; <u>accord</u>, <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); <u>Parker v. Bowen</u>, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

As previously mentioned, Public Law 104-193, the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended by Public Law 105-33, the Balanced Budget Act of 1997, requires all supplemental security income childhood disability beneficiaries, who were eligible as children in the month before they attained the age of 18 to have their eligibility redetermined under the adult standards either during the one year period beginning on the claimant's 18th birthday, or in lieu of a continuing disability review, whenever the Commissioner determines that a case is subject to redetermination. Accordingly, the Plaintiff's claim is analyzed under the adult five step evaluation, utilized in all adult cases.

---

[5]Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6]42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2003) (All further references to 20 C.F.R. will be to the 2003 version unless otherwise specified.).

[7]42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

Under this analysis the ALJ must follow five steps in evaluating a claim of disability.[8]  First, if a claimant is working at a substantial gainful activity, he is not disabled.[9]  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11]  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[12]  Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the

---

[8]20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9]20 C.F.R. § 404.1520(b).

[10]20 C.F.R. § 404.1520(c).

[11]20 C.F.R. § 404.1520(d).

[12]20 C.F.R. § 404.1520(e).

[13]20 C.F.R. § 404.1520(f).

[14]Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987).  See also Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

national economy.[15]  The Commissioner may satisfy this burden by pointing to the Grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19]  Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20]  Only after the Commissioner meets this burden does the burden shift back

---

[15]Doughty, 245 F.3d at 1278 n.2.  In Doughty the court explained this burden shifting as follows:
> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations. (Internal citations omitted).

[16]Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[17]Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996).  See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[18]Walker, 826 F.2d at 1003.

[19]Wolfe, 86 F.3d at 1077-78.

[20]See id.

6

to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

## IV.  SUMMARY OF THE RECORD EVIDENCE

Given the issues presented in this case, the Court will focus upon the record evidence dealing with the Plaintiff's IQ and academic skill development, and secondly upon the record evidence dealing with plaintiff's adaptive functioning or daily living activities.

### A.  Background

The Plaintiff was born on May 10, 1983, and was twenty years old at the time of the ALJ's decision.  (Doc. 19 at 3.)  He lives with his parents and has two sisters.  (R. 162, 238.)  Plaintiff has been home-schooled since the sixth grade, participating in the Exceptional Student Education program for children with learning disabilities.  (R. 235.) At the time of the decision he had completed the tenth grade.

### B.  IQ Scores And Academic Skills Development

In December of 1990, when Plaintiff was seven years old, school psychologist Andrew A. Nott issued a report of psychological services on behalf of Exceptional Student Education for Citrus Country, Florida, explaining the reason for the referral of Plaintiff to the special education program.  (R. 91-94.)  The school psychologist noted that Plaintiff struggled with his academic skills, speech/language development, fine/gross motor functions, and that Plaintiff's testing results on the Wechsler Intelligence Test for Children-Revised placed him in the low average range of intelligence.  At that time,

---

[21] Bowen v. Heckler, 748 F.2d 629, 631, 636-37 (11th Cir. 1994).

7

Plaintiff had a verbal IQ of 102, a performance IQ of 85 and a full scale IQ of 92. However, Plaintiff's scores on the subtests of the particular skill sets varied greatly. For example, his verbal comprehension was in the high average range at the seventy-fifth percentile while his perceptual organizational skills put him only in the sixteenth. Plaintiff was found to be acquiring "school related knowledge" at an appropriate age level at this time.

Plaintiff's test results disclosed that he struggled in areas at this early age, which would continue to give him difficulty. These included sequencing tasks that involved sustained attention and concentration, mental arithmetic, short term auditory memory, nonverbal concept formation, and visual planning skills. (R. 93-94, 88, 260.) However, as the record evidence shows, Plaintiff continued to have stronger scores in word knowledge and puzzle assembly (R. 93, 254), and was of average ability in factual and practical knowledge and long term visual memory. (R. 93, 260.)

In 1990, on the individual achievement tests of the Kaufman Test of Educational Achievement-Comprehensive, he showed skill development at a level well below average for his age. The school psychologist recommended placement in a Specific Learning Disability Program[22] and made other suggestions for techniques to improve Plaintiff's educational development.

In 1990, Plaintiff's reading decoding skills were significantly better than his math application skills (R. 93.), but when re-examined in June of 1993 and 1994, Plaintiff was

---

[22] Drs. Goldman and Ross, after conducting their examinations a few years later, found that Plaintiff had some attention problems but did not fit the criteria for a learning disability or attention deficit disorder. (R. 259, 241.)

still having great difficulty learning to read. [23]  (R. 86-87, 88.)  In 1995, Plaintiff's teacher completed a questionnaire in which she stated that although Plaintiff was in sixth grade, he reads on a second grade level and does math on a third grade level.  (R. 74.) Her overall assessment was that Plaintiff "[wa]s a pleasant child with generally low academic skills.  He requires constant repetition and review in order to keep information." (R. 76.)

In November of 1993 when the Plaintiff was in the fourth grade, Dr. Goldman evaluated him at the Psychology Clinic of the University of Florida.  (R. 256.)  She found that Plaintiff actually showed declining academic achievement from the testing done three years earlier.  (R. 260.)  On the WISC-III, Plaintiff's verbal IQ was 80, his performance IQ was 65, and his full scale IQ was 70.  Dr. Goldman speculated that Plaintiff's developmental delay might be due to short-term memory problems, visual-spatial skill, and /or language deficiencies.  She recommended that Plaintiff receive help to work on his speech, be evaluated for possible use of medication to improve his attention, and that Plaintiff participate in activities outside of school so that he could meet new people and feel more socially accepted.  (R. 260, 263.)

In June of 1994, Plaintiff was evaluated at the Neurodevelopmental Clinic at the University of Florida, College of Medicine.  Dr. Nackashi and other medical personnel evaluated the Plaintiff and found that Plaintiff was "functioning in the low average range of intelligence but has a wide range of abilities." This conclusion was based on their clinical observations, review of Plaintiff's records, and the use of various developmental screening tools  The examiners in this clinic speculated that the decline in Plaintiff's

---

[23]  Throughout the record there are references to Plaintiff's mother having dyslexia and Plaintiff possibly having a similar learning disability. (R. 365.)

performance in fourth grade may have more to do with the expectation of what fourth graders should be able to do and their ability to perform abstract thinking rather than from an actual decline in Plaintiff's intelligence.  They continued to emphasize that the Plaintiff's attention problems may be the source of his other difficulties.  (R. 254.)  After consultation, clinical psychologist Gary Honickman suggested that Plaintiff most likely had a Developmental Reading Disorder.[24]   (R. 342.)  Agency clinicians found Plaintiff had Developmental Articulation Disorder and while not mentally retarded, had a borderline IQ.  (R. 343.)

In November 1995, Dr. John J. Ross ("Dr. Ross"), a professor in Pediatric Neurology at the University of Florida College of Medicine, recommended that Plaintiff undergo another assessment by clinical psychologist Dr. Fennell.  Dr. Fennell found that in comparison to other children his age, Plaintiff's cognitive functioning was impaired and his performance on tests of general intellectual functioning was in the Borderline range. He continued to show academic difficulties, but the psychologists opined that Plaintiff could make some advancement in academics, although at a slower rate than others of his age.  Plaintiff's scores on the various tests ranged from within normal, even high given his level of intellectual functioning, to very low.  On the Weschler Intelligence Scale for Children III (WISC-III), Plaintiff had a verbal IQ of 79, a performance IQ of 71, and a full scale IQ of 73.  Plaintiff's difficulties resembled those of people with right hemisphere

---

[24] A Reading Disorder is characterized by "reading achievement that falls substantially below that expected given the individual's chronological age, measured intelligence, and age-appropriate education." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 51 (4th ed. 1994) [hereinafter DSM-IV].

lesions on their brain, although an MRI and EEG showed that Plaintiff had no such abnormalities.  (241.)

In 1997, Plaintiff's teacher, Susan Castorina, who supervised his homebound schooling, noted that Plaintiff had made improvements in his reading decoding but was not capable of "simple, concrete comprehension or abstract thought."  In mathematics, he did not have the ability to apply concepts or do any word/real life problems but was improving on his basic number facts.  (R. 164.)  However, according to the Individual Education Plan developed for Plaintiff as of March 6, 2001, Plaintiff was pursuing a standard diploma from high school through his homebound schooling program, though at a modified pace.  (R. 146-155.)  At this time, Plaintiff was in the tenth grade and his mother requested that Plaintiff be able to study at home to "prevent falling" and receive instruction to help with his learning disabilities.  (R.157.)

In a psychological evaluation performed in October of 2001 by Rodney Poetter, Plaintiff was again diagnosed with borderline intelligence in the fifth percentile.  In his evaluation of Plaintiff, Dr. Poetter administered the Wechsler Adult Intelligence Scale-III ("WAIS-III").  From this test he determined that Plaintiff had a verbal IQ of 86, a Performance IQ of 69 and a full scale IQ of 76.  Dr. Poetter also noted that Plaintiff gets along well with others, performs household chores, "maintains his normal interests," and could direct someone to help him with any financial matters.  (R. 444.)  Based on these assessments, the agency found that Plaintiff no longer qualified for disability ( R. 446.)

## C.  Other Areas Of Functioning

Despite the diagnosis of Borderline Intellectual Functioning, with respect to other areas of his life, Plaintiff was quite adept. From an early age, his teachers, psychologists, and doctors noted that Plaintiff was very sociable and tended to score highly on tests measuring socialization. (R. 91, 93.)  He was well liked by his peers in the early grades and had friends as he grew up, although he lives a somewhat isolated life.   (R. 91, 76, 161, 164.)  Even though Plaintiff struggled with academics, his teachers often said he was quite motivated and had no behavioral problems.  (R. 91, 74, 161.)  In terms of Plaintiff's abilities with activities of daily living, a benefits reconsideration report filed in 2000 or 2001, discloses that Plaintiff's mother stated that Plaintiff grooms himself, cooks for himself, mows the lawn, and socializes well with others.  (R. 194.)

Few doctors or psychologists found any significant physical or medical impairments with Plaintiff once he started school.  (R. 91.)  In 1993,  Dr. Goldman noted that the Plaintiff was in good health and seemed to be reserved, calm, and well-liked by his peers.  (R. 259.)  Dr. Ross diagnosed the Plaintiff with a past history of floppy baby syndrome,[25] and motor coordination problems, "poor scapular stability," (R. 243) and static encephalopathy.  (R. 247.)  On September 5, 1997, Plaintiff saw Dr. Medero who found that Plaintiff had no respiratory impairment, no inflammation in the joints of his hands, and his range of motion was normal.  Dr. Medero noted nothing unusual about Plaintiff's spine, gait, or grip.  (R. 368.)  On November 9, 1997, Plaintiff was found to

---

[25]  Floppy-baby (or infant) syndrome is defined as "[a]n abnormal condition in infants, marked by loss of muscle tone (muscle firmness), diminished muscular activity, and a delay in general development." 2-F Attorneys' Dictionary of Medicine 2578 (2004).

meet the disability Listing of 110.07A.[26]  However, the examiner also found that the

limitations on his functioning all fell into the "less than marked" category.  (R. 377.)

In 2001, Plaintiff was evaluated by Dr. Raju for the State of Florida, Department of

Health.  Dr. Raju found that the Plaintiff had a history of Floppy Baby Syndrome and

asthma, but both were stabilized, and nothing else was abnormal about Plaintiff

physically.  (R. 421.)   In April of 2003, although Dr. Hippolito noted that Plaintiff could

not work due to his condition (R. 511), Dr. Hippolito's clinical notes do not disclose or

discuss any significant physical abnormalities.  (R. 522-528.)

Based on an interview with the Plaintiff, the Florida Department of Health

determined that due to Plaintiff's progress in the homebound study program, his skill with

computers, and his desire to work, Plaintiff's impairments would not preclude "gainful

employment," even if such work must be sedentary.  This agency found that Plaintiff

could communicate effectively, and that he completed his daily life activities

independently.  (R. 199-200.)  The agency official, who completed the Mental Residual

Functional Capacity Assessment for Plaintiff in November of 2001 for the Social Security

Administration, found that Plaintiff's ability was no more than moderately limited, but with

respect to most activities, there were no significant limitations.  The agency psychologist

recommended that Plaintiff could perform simple, repetitive tasks despite his difficulty

with abstract or complex processes.  (R. 425.)  In the Psychiatric Review completed for

the agency in November, the agency psychologist found only mild restrictions on

---

[26]  This is the listing for Impairments that Affect Multiple Body Systems.  There is no longer a
Listing category for 110.07A, but 110.08 appears to encompass what Plaintiff would claim caused his
impairment--a catastrophic congenital abnormality or disease.  20 C.F. R. Pt. 404 App 1.

Plaintiff's activities of daily living and ability to maintain social functioning.  The

psychologist did note moderate limitation in Plaintiff's ability to maintain concentration,

persistence or pace.  ( R. 437.)

Dr. Ross recommended that Plaintiff attend occupational, physical, and speech

therapies.  Plaintiff attended occupational therapy and physical therapy twice a week

from 1995-1997.  He attended speech therapy three times a week.  In the last reports for

each type of therapy in this time period, all of the therapists working with Plaintiff noted

his steady and/or good progress toward attaining his goals.  (R. 274, 275.)  Plaintiff

resumed physical and occupational therapy in 1999 (R. 269-273) and all three types of

therapy again in 2001.  (R. 379.)  As of May 27, 2003, Plaintiff's occupational therapist

noted that he has impaired visual tracking and limited calculation skills, requiring

assistance for making change, counting money, or filling in a check register.  (R. 512.)

As of the same date, his physical therapist noted that Plaintiff has good balance and

strength in the upper and lower extremities and continues to show improvement.  (R.

513.)  An MRI taken on June 2, 2003, showed no significant abnormalities.  (R. 524.)

**D.  Testimonial Evidence**

During the hearing on February 13, 2003, Plaintiff testified that he took some pain

medication because of arthritis in the joints of his hands (R. 552), that he cannot sit for

very long periods of time (R. 553), and that he cannot lift anything heavy.  (R. 554.)  His

math skills at that time were at a second grade level and his reading and language skills

at a sixth grade level.  (*Id.*)  Plaintiff described his difficulties with visual scanning and his

feelings of anxiety when in extremely crowded places. (R. 561.)  Plaintiff also testified

that he cannot finish tasks quickly because he has a problem with paying attention.  (R.

14

562.)  Plaintiff's mother testified that in some respects Plaintiff is fairly intelligent, but at the same time he cannot make change quickly or tell time on a regular clock.  (R. 568.) Plaintiff is able to read a newspaper and cook, and he is interested in a job with computers or in the culinary field.  (R. 567.)

## V.  DISCUSSION

### A. The Listings

Plaintiff contends that he should have been found disabled because his impairments meet or equal Listing 12.05 for mental retardation. According to Plaintiff, the ALJ erred in not using Plaintiff's lowest IQ score to determine whether Plaintiff's IQ fell into the range of mental retardation specified in  Listing 12.05 and did not weigh the evidence properly to determine if Plaintiff had additional physical or mental impairments that met the criteria for disability under 12.05C or 12.05D. The Commissioner argues that the ALJ was not required to address whether Plaintiff met Listing 12.05 because none of Plaintiff's doctors or psychologists diagnosed him with mental retardation, a  necessary component of satisfying Listing 12.05.

### 1.  Diagnosis of Mental Retardation

Unlike other mental disorders, the listing for mental retardation requires that the claimant's impairment "satisf[y] the diagnostic description in the introductory paragraph" *and* any one of the four sets of criteria that follow it.[27]  In determining whether a claimant

---

[27]  20 C.F.R. Part 404, App. 1, Subpart P, 12.00A, ¶ 4.  Where adults have not had intelligence testing prior to age 18, a diagnosis of mental retardation satisfying the diagnostic requirement of this Listing could be inferred from the plaintiff's history and current functioning.  However, where as here, the Plaintiff had intelligence testing performed, those tests must substantiate a diagnosis of mental retardation.  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,753 (Aug. 21, 2000) (to be codified at 20 CFR Parts 404 and 416).

has "[met] a listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings. . . ."[28]  Pursuant to 20 C.F.R. 404.1525(c), the introductory portion of each Listing defines or explains key specific medical findings which may be required to establish a diagnosis or confirm the existence of the impairment in order to meet the Listing.

Under Listing 12.05, an individual is mentally retarded if they have a "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." [29]  The definition of mental retardation in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") parallels the definition in the Listing.[30]  General intellectual functioning refers to an IQ of about 70 or below on various standardized intelligence tests.  While Plaintiff is correct that the ALJ is required to consider the lowest IQ score on all tests administered to determine if Plaintiff's IQ fell within the range for mental retardation under the Listing,[31] IQ alone is not enough to determine mental retardation.  "Impairments in adaptive functioning, rather than low IQ,

---

[28]  Wilson v. Barnhart, 284 F.3d 1219, 1224 (11th Cir. 2002).

[29]  Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997) (finding that at the very least, to be considered for disability benefits under Listing 12.05, the claimant must meet all parts of the diagnostic definition in the introductory paragraph: "(1) significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." Once these three elements have been established, the court looks to paragraphs A ,B, C, and D to assess the severity of Plaintiff's mental retardation and its impairment on plaintiff's ability to work.

[30]  "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning that is accompanied by significant limitations in adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety."  DSM-IV at 40.

[31]  Ambers v. Heckler, 736 F.2d 1467, 1470 (11th Cir. 1984).

are usually the presenting symptoms in individuals with Mental Retardation."[32]   While the IQ often remains stable, adaptive function can improve with training.[33]   Therefore, a valid IQ score is not enough to determine if someone is mentally retarded.[34]

As discussed above none of Plaintiff's doctors or psychologists diagnosed the Plaintiff with mental retardation. Drs. Poetter, Fennell, and Nackashi made diagnoses of borderline intellectual functioning/low average intelligence, but also noted that Plaintiff did not have significant impairments in his adaptative functioning.  (R. 444, 241, 254.) Plaintiff's most recent IQ scores in 2001 from Dr. Poetter based on the WAIS-III reflect a verbal IQ of 86, a Performance IQ of 69 and a full IQ of 76.  (R. 442.)   In 1995, Plaintiff had a verbal IQ of 79, a performance IQ of 71, and a full scale IQ of 73 on the WISC-III. (R. 238.) Given the lack of evidence in the record that the Plaintiff was mentally retarded based on his IQ scores or adaptive functioning abilities, the ALJ did not err in his disability determination by failing to find that Plaintiff's impairments met or equaled Listing 12.05.

## 2.  "Other impairments" under Listing 12.05C and 12.05D

Moreover, even if Plaintiff had met the first part of Listing 12.05, Plaintiff still did not satisfy the second part of the Listing contained in 12.05C or 12.05D.  Listing 12.05C requires that in addition to the diagnosis of mental retardation, the Plaintiff must have "a

---

[32] DSM-IV at 42.

[33] Id.

[34] "Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning."  See Lowery v. Sullivan, 979 F.2d 835, 837(11th Cir. 1992) ("[A] valid IQ score need not be conclusive of mental retardation where the I.Q. score is inconsistent with the other evidence in the record on the claimant's daily activities and behavior.") (citing Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986)).

valid verbal, performance, or full scale IQ of 60 through 70 <u>and</u> a physical or other mental impairment imposing an additional and significant work-related limitation or function."[35]  To satisfy 12.05D, the claimant must have the same IQ score as 12.05C, and meet at least two of the following: "1.  Marked[36] restriction of activities of daily living; or 2.  Marked difficulties in maintaining social functioning; or 3.  Marked difficulties in maintaining concentration, persistence, or pace; or 4.  Repeated episodes of decompensation,[37] each of extended duration."

According to <u>DSM-IV</u>, even those individuals diagnosed with Mild Mental Retardation (having IQ levels from 50-70) are able to achieve academic skills up to the sixth grade level[38] and "social and vocational skills adequate for minimum self-support" though they may need additional support or supervision.[39]  Therefore, a diagnosis of mental retardation alone is not enough to find that the Plaintiff is disabled.

In determining the extent of Plaintiff's limitations for the purpose of determining the Plaintiff's Residual Functional Capacity (R. 22) , the ALJ mirrored the criteria or areas

---

[35]  20 C.F.R. Part 404, App. 1, Subpart P, 12.05(c).

[36]  In the final rules, the agency clarified the difference between "marked" and "extreme" on its four-point scale for assessing severity of an impairment for an adult.  A rating of "extreme" in any <u>one</u> area of functioning means that an individual automatically meets the Listing-level of severity for the impairment because the individual cannot engage in any gainful activity.  To be found to have a Listing- level impairment, a Plaintiff must have "marked" limitations in <u>two</u> areas of functioning.  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. at 50,755.  The areas of functioning are those set forth in 12.05D: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  The Plaintiff only received a "marked" evaluation from the agency in the third area--concentration, persistence or pace.  (R. 437).

[37]  This criteria refers to a "worsening of a mental disorder due to failure of defense mechanisms" for dealing with the stresses of daily life for an extended period of time.  2-D <u>Attorneys' Dictionary of Medicine</u> 555 (2004).

[38]  Plaintiff testified to reading at a sixth grade level.  (R. 554.)

[39]  <u>DSM-IV</u> at 43.

of functioning found in Listing 12.05D.  With respect to 12.05D.1, the ALJ found that

there were  no marked restrictions on Plaintiff's activities of daily living as evidenced by

the fact that Plaintiff can go to the store to buy food and clothing for himself, does his

own laundry, helps with the housework, gardens and mows the laws.  (R. 19.)  With

respect to social functioning under 12.05D.2, the ALJ noted that Plaintiff has friends that

he visits with daily and that Plaintiff describes himself as outgoing.  Under 12.05D.3, the

ALJ found that while the claimant has "moderate deficiencies in concentration,

persistence, and pace as found on testing," Plaintiff uses the computer, reads, and plans

on completing school and seeking employment.  Finally, no episodes of decompensation

were noted in the record.  (*Id.*)

Because there was substantial evidence in the record supporting these findings

by the ALJ, the Plaintiff also failed to satisfy the criteria set forth in the second prong of

Listing 12.05  C or D. Accordingly, Plaintiff's argument that the ALJ erred by failing to find

that he met listing 12.05 C or D is without merit.

## B. Duty To Develop The Record

In addition to Plaintiff's argument that he met Listing 12.05,  the Plaintiff also

contends that the ALJ failed to develop the record in three areas.  First, Plaintiff asserts

that the ALJ should have ordered a consultative exam by a neuro-opthamologist to

determine the extent of Plaintiff's impairment caused by his hand/eye coordination

problems.  Second, Plaintiff argues that the ALJ did not take adequate steps to develop

and assess the opinion of Dr. Hippolito, who stated that Plaintiff was unable to work due

to a medical condition.  Finally, Plaintiff contends that the record was not developed

adequately with respect to the reasons Plaintiff received homebound schooling.  (Doc.

19 at 10-11.)  Plaintiff also asserts that his physical limitations, especially with regard to his range of motion, ability to lift, back problems, and balance were not taken into consideration by the ALJ.

Turning first to the duty to develop the record  "It is well established that the ALJ has a basic duty to develop a full and fair record."[40]  This obligation exists whether or not a claimant is represented by counsel.[41]  As a hearing is non-adversarial in nature,[42] the duty to develop the record is triggered when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.[43]

With respect to Plaintiff's first contention that a consultative examiner should have been called to assess Plaintiff's visual-spatial impairment, while there is some evidence that Plaintiff has some impairment of his visual tracing abilities, given the substantial evidence of record establishing the other activities the Plaintiff is able to do--using the computer, reading, doing household chores--the severity of the visual-spatial impairment has not affected Plaintiff's ability to pursue most activities of daily living or other areas of functioning.  Where, as here, there is sufficient evidence from professionals assessing the Plaintiff's impairments the ALJ is not "obligated to seek independent, additional expert medical testimony."[44] Moreover, while Plaintiff asserts that such a problem could

---

[40]  Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003);  20 C.F.R. § 416.912(d) ("Before we make a determination that you are disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application . . . .").

[41]  Zaldivar, 81 F. Supp. 2d at 1359.

[42]  Id.

[43]  See Mason v. Barnhart, 63 Fed. Appx. 284, 287 (9th Cir. 2003).

[44]  Wilson v. Apfel, 179 F.3d 1276, 1278 (11th Cir. 1999).

prevent him from driving, whether Plaintiff can drive has little to do with assessing the physical or mental limitations on his ability to work.

There is also no merit to Plaintiff's argument that the ALJ should have re-contacted Dr. Hippolito regarding his note that Plaintiff was unable to work due to a medical condition. The ALJ is only required to re-contact a medical source when the evidence received from the medical source is inadequate to determine whether the claimant is disabled.[45]   Although Dr. Hippolito's note (R. 511) is not particularly descriptive of Plaintiff's condition, the ALJ had the benefit of the rest of Dr. Hippolito's clinical notes (R. 522-28), which evidence that there was nothing significantly abnormal about Plaintiff upon physical examination.  Additionally, Dr. Hippolito's note was inconsistent with the other medical opinions in the record, none of which found any substantial physical impairments precluding the Plaintiff from working.[46]   Accordingly, the ALJ was not required to re-contact Dr. Hippolito in order to make a disability determination in this case.

Lastly, with respect to Plaintiff's argument that the ALJ failed to develop the record concerning the reasons for Plaintiff being home schooled, there is sufficient evidence in the record to establish that Plaintiff was schooled at home to prevent injury at school.

---

[45] 20 C.F.R. § 404.1512(e)

[46] Although, there is medical evidence that Plaintiff had some physical problems none of them impacted his ability to work.  For example, even though Plaintiff's range of motion was less than a full range of motion, it was still within normal based on Dr. Raju's findings.  (R. 521).  Further, Plaintiff's physical therapist  found he had good balance.  (R. 413.)  And Plaintiff's back problems seemed to be under control  with medication and were not described as severe anywhere in the record.  Finally, the ALJ's RFC assessment found that the Plaintiff could perform unskilled work, which does not necessarily require great strength as defined under the Social Security Regulations. Unskilled work is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  The job may or may not require considerable strength."  20 C.F.R. § 416.968.

(R. 65, 157).  As this has little do with Plaintiff's ability to work now or Plaintiff's IQ, there was no need to further develop the record on this point. There is substantial evidence in the record that Plaintiff's floppy baby syndrome had stabilized and, through occupational and physical therapy, Plaintiff's strength and physical abilities had improved to the extent that there was minimal interference with his activities of daily living or other areas of functioning.

## VI.  CONCLUSION

In view of the foregoing, it is hereby **ORDERED** that the decision of the Commissioner is **AFFIRMED** and the Clerk is directed to enter judgment accordingly and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on September 29, 2005.

GARY R. JONES
United States Magistrate Judge

Copies to:
All Counsel

22